EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re: | 2007 TSPR 177 |
| Lucas Irisarri Castro | 172 DPR _____ |

Número del Caso: CP-2005-1

Fecha: 28 de septiembre de 2007

Oficina del Procurador General:

Lcda. Noemí Rivera De León
Procuradora General Auxiliar

Abogados de la Parte Querellada:

Lcda. Vera T. Peñagarícano
Lcdo. Gabriel I. Peñagarícano
Lcdo. Juan T. Peñagarícano, Jr.

Materia: Conducta Profesional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

CP-2005-1

Lucas Irisarri Castro

PER CURIAM

San Juan, Puerto Rico, a 28 de septiembre de 2007.

El licenciado Lucas Irisarri Castro, en adelante licenciado Irisarri Castro, fue admitido al ejercicio de la abogacía el 25 de junio de 1991 y al ejercicio del notariado el 27 de octubre de 1992.[1]

El 14 de junio de 2001, fue presentada ante este Foro una queja contra el referido abogado por parte del licenciado José Ángel Rey, en adelante licenciado Rey o el quejoso.

En la misma, alegó, entre otras cosas, que el licenciado Irisarri Castro incurrió en conducta

---

[1] El abogado de epígrafe fue admitido a la práctica de la abogacía en su país natal, España, en el año 1969.

violatoria de los Cánones 15, 17, 18, 29, 30 y 35 de Ética Profesional por, entre otras cosas, utilizar un lenguaje ofensivo contra un litigante adverso y contra un compañero abogado, presentar una demanda injustificada, dejar de desempeñarse de forma profesional, hacer imputaciones falsas sobre la reputación de otro letrado, no observar un trato generoso y considerado para con un compañero abogado y utilizar métodos inconsistentes con la verdad. Veamos los hechos que dieron inicio al ejercicio de nuestra jurisdicción disciplinaria.

I

El presente procedimiento disciplinario tiene su génesis en una disputa por la administración de los bienes hereditarios de la licenciada Ivette Josefina Orraca López, en adelante licenciada Orraca López o la causante, fallecida el 2 de marzo de 2000, sin haber contraído matrimonio y sin legitimarios. En síntesis, la referida disputa se suscitó porque, previo a su muerte, la causante otorgó al menos tres (3) testamentos ológrafos incompatibles entre sí.

En uno de éstos, otorgado el 14 de marzo de 1999, revocatorio de otro de 22 de noviembre de 1998, la licenciada Orraca López instituyó como heredera universal de sus bienes a la señora Dionisia Flecha Quiñones, en adelante señora Flecha Quiñones o la heredera, quien, a su vez, contrató al licenciado Irisarri Castro para que la representara en las gestiones de adveración y

protocolización del referido testamento. Mientras éste se encontraba realizando dichas gestiones, la señora Carmen Lebrón Morges, en adelante señora Lebrón Morges o la albacea-legataria, se comunicó con el licenciado Irisarri Castro para indicarle que tenía en su poder un testamento ológrafo posterior y distinto, otorgado el 21 de mayo de 1999, mediante el cual la causante designó como única y universal heredera de sus bienes a la señora Flecha Quiñones, designando a la señora Lebrón Morges como albacea testamentaria, legándole, además, ciertos bienes de su caudal.

Ante esta situación, el licenciado Irisarri Castro le indicó que tenía que conseguir un abogado para que la representase en los trámites relacionados con su albaceazgo para así evitar un conflicto de intereses ya que él era el abogado de la heredera testamentaria.

La señora Lebrón Morges procedió a contratar los servicios profesionales del licenciado José Ángel Rey, quien, cabe destacar, por muchos años fue el abogado, tanto de la causante como de la madre de ésta, y quien, al mismo tiempo, conocía hace algunos años a la albacea-legataria.

El 12 de junio de 2000, luego de varias discrepancias entre los abogados de las señoras Flecha Quiñones y Lebrón Morges relacionadas, esencialmente, con la administración de los bienes hereditarios por parte de la señora Lebrón Morges, así como con el contrato de servicios profesionales

suscrito entre ésta y su abogado, el licenciado Irisarri Castro, en representación de la heredera, presentó una demanda contra la señora Lebrón Morges y el licenciado Rey, entre otros. Mediante la misma, impugnó las cartas testamentarias expedidas por el Tribunal de Primera Instancia a favor de la albacea-legataria. Solicitó, además, que se declarase nulo el contrato de servicios profesionales suscrito entre la albacea-legataria y el licenciado Rey y la indemnización en daños y perjuicios para su cliente.[2]

Es precisamente a partir de la presentación de esta demanda, y de los escritos que posteriormente se cursaron los licenciados Irisarri Castro y Rey, que se inicia el procedimiento disciplinario de marras.[3]

En la referida demanda, el licenciado Irisarri Castro cuestionó el contrato de servicios profesionales suscrito entre el licenciado Rey y la señora Lebrón Morges, así como lo que, a su entender, era la verdadera motivación del licenciado Rey en el caudal hereditario de la causante.

---

[2] Presentado ante el Tribunal de Primera Instancia, Sala Superior de San Juan, bajo el número KAC-2005-3125.

[3] Conviene resaltar que si bien la queja contra el licenciado Irisarri Castro fue presentada el 14 de junio de 2001, el Procurador General nos solicitó paralizar los procedimientos bajo el fundamento de que los hechos relacionados con dicha queja estaban dilucidándose en un litigio. Mediante Resolución de 7 de diciembre de 2001, paralizamos los referidos procedimientos. Posteriormente, mediante Resolución de 28 de abril de 2004, ordenamos la continuación del proceso disciplinario. Esto, luego de que el foro intermedio apelativo adjudicara la controversia que después fue revisada por este Tribunal.

El licenciado Irisarri Castro intimó que la albacealegataria y su abogado se habían puesto de acuerdo para perjudicar a la heredera, así como para que el licenciado Rey cobrara unos dineros que la causante le adeudaba por servicios profesionales prestados en vida de ésta. A esos extremos, expresó que la albacea-legataria y su abogado habían efectuado unas operaciones en las cuentas bancarias dejadas por la causante para "poner el dinero fuera del alcance de la heredera y de esa forma poder **el Lcdo. Rey cobrar más cómodamente el 15% que se auto-asignó** para remunerar unos trabajos que la heredera nunca le encomendó." En otra de sus alegaciones, el letrado de epígrafe expresó que el licenciado Rey tramitó las cartas testamentarias a favor de su cliente en un "procedimiento que se siguió sorpresivamente **y a traición**,… mientras el Lcdo. Rey dialogaba con el abogado que suscribe para establecer qué trámites y a cargo de quién habrían de hacerse en la herencia." (Énfasis suplido).

El licenciado Irisarri Castro, además, expresó lo que, a su entender, era la verdadera intención del licenciado Rey al pactar sus honorarios por servicios profesionales con su cliente. Se expresó de la forma siguiente:

> "Todo lo hasta aquí explicado denota **un plan maquiavélico concebido entre la legataria y su abogado[,] el Lcdo. Rey,** para perjudicar seriamente a la demandante y **apropiarse la legataria de lo que no le da el testamento,** obligando de paso a la heredera a pagar, incluso con su patrimonio[,] si no bastare el de la herencia, **un 15% a favor del heredero**

**postizo adicional en que se ha convertido el Lcdo. Rey.**" (Énfasis suplido).

Posteriormente y luego de que la parte demandada presentara una solicitud de sentencia sumaria, el licenciado Irisarri Castro, en representación de la heredera demandante, presentó una "Solicitud Urgente de Remedios Provisionales y Sobre Descalificación de Abogado", mediante la cual, una vez más, puso en entredicho la relación abogado-cliente de la albacea-legataria y el licenciado Rey. Asimismo, comentó extensamente sobre las relaciones íntimas y personales de la causante con las señoras Flecha Quiñones y Lebrón Morges.

A esos extremos, el referido letrado hizo las alegaciones siguientes:

"…Tan voluble última voluntad de la causante se debía a los **altibajos sentimentales que mantenía respecto a su amiga, la demandada Carmen Elizabeth Lebrón Morges. Tan pronto la ponía como la quitaba de heredera, según el calor de sus relaciones**…"

"A su vez, el demandado Lcdo. José Ángel Rey, era amigo personal de la madre de la causante y de ésta misma……por eso, cuando murió doña Francisca[4], y a los pocos meses su hija, la causante de epígrafe, **sin que se acordasen para nada de él en el testamento, creyó llegada la hora de sus desvelos profesionales.**"

"**Se juntó el hambre con las ganas de comer: el despecho de la codemandada** doña Carmen Elizabeth, desplazada de su condición de heredera por una humilde peluquera y privada de la casa de la difunta, en la que ella había vivido y cuyo dominio final esperaba **y la apetencia crematística del Lcdo. Rey**, para

---

[4] Se refiere a la madre de la causante, quien premurió a ésta y quien, además, había sido cliente del licenciado Rey.

intentar cobrarse los trabajos que durante tantos años había realizado en beneficio de la familia."

"**Ambos se pusieron de acuerdo.** Para virtualizar sus respectivos propósitos-**el de la albacea y legataria, perjudicar a la heredera y desposeerla de la herencia; el del abogado, apropiarse de una parte importante del caudal por vía de honorarios profesionales** – **diseñaron un plan** a cuyo tenor la albacea……firmó un contrato de servicios profesionales con el Lcdo. Rey, a cambio de un 15% del caudal, le encomendó abarcadoras gestiones…"

"Dicho contrato quedó formalizado **mediante carta secreta del abogado a la albacea**…de fecha 13 de marzo de 2000. Las conversaciones del abogado con la albacea y legataria y la preparación de ese contrato **fueron unos secretos, particulares, tramados en la oscuridad,** para que ni la heredera ni su abogado pudieran enterarse ni objetar. **La doblez y la malicia del codemandado Rey es de tal calibre que no tuvo escrúpulo de mentir al respecto, en corte abierta.**"

"Sin embargo, la parte compareciente no desconfió del Lcdo. Rey cuando en plena vista se ofreció como notario para la escritura de protocolización. **No teníamos idea de la doblez de este compañero y de sus malas artes.**"

"Eso lo prometía el Lcdo. Rey, o sea, informar de sus honorarios notariales por autorizar la escritura de protocolización previo a firmarla, para que en ese momento no pusiésemos objeción a su intervención como notario. Eso lo afirmaba de pie en estrado, ante el juez y ante nosotros. La realidad era que a ese momento, el Lcdo. Rey ya tenía en su maletín, firmado por la albacea, un contrato de servicios profesionales……**Pero le convenía estar mansito ante el Juez y ante este abogado,** para que le permitiéramos fungir como notario público. **Tenía preparada la puñalada y nos la dio**…"

"No existe en derecho una sola razón que justifique **este ridículo carrusel de dinero y bienes que nos quiere llevar el Lcdo. Rey y su clienta:** arrebatarle los bienes a la heredera para después devolvérselos, pero con un 15%

menos. El verdadero propósito no es otro que castigar a la demandante porque salió heredera, y de paso, **llevarse el Lcdo. Rey una tajada considerable del caudal, sin más méritos que su personal atrevimiento.**"

"………Para legitimar aparencialmente su actuación ante terceros desprevenidos, consiguió……unas cartas testamentarias **en que, nuevamente, engañó al Tribunal.** Presentó un proyecto de resolución en el que **introdujo subrepticiamente una facultad exorbitante** que ni el Código Civil ni el testamento le dan al albacea…"

"Mediante este escrito, le estamos solicitando al tribunal que no permita a un miembro del Colegio de Abogados de Puerto Rico como es el Lcdo. Rey, **que se comporte con semejante destemplanza y avidez de dinero.** Los honorarios son simplemente eso, una paga de honor, y cuando falta éste, **lo que queda es simple mercantilismo vulgar**…"

"…También saldrá a relucir, más si cabe, **la doblez y la mala fe de la parte demandada**, al estipular un contrato de servicios profesionales adjudicando al abogado un 15% del caudal, por trabajos **que cualquier profesional honrado** puede hacer por dos o tres mil dólares como mucho." (Énfasis suplido en todos los párrafos).

En su solicitud de descalificación, el licenciado Irisarri Castro planteó, entre otras cosas, que el licenciado Rey estaba impedido de fungir como abogado de la albacea-legataria y como notario del procedimiento de adveración y protocolización del testamento ya que tenía intereses personales en la herencia. Esto, en virtud de que la causante le adeudada honorarios por servicios profesionales prestados previo a su fallecimiento. Le imputó, además, haber infringido los Cánones 21 y 35 de

Ética Profesional. No obstante, tales señalamientos de infracciones éticas no fueron presentados bajo juramento.

Posteriormente, la parte demandante, representada por su abogado, presentó su oposición a la moción de sentencia sumaria. En dicho escrito, una vez más, el licenciado Irisarri Castro expresó que de no ser por **"la desmesurada ambición de dinero del licenciado Rey**, este caso no existiera."  Indicó, además, que el abogado de la albacea-legataria actuaba como "mentor y abogado" de ésta y que, a su vez, lo único que perseguía era **"llevarse una suculenta tajada de la herencia."**  Esgrimió, por otra parte, que la albacea-legataria había sido **"la misma persona que vivió largos años en la casa de la difunta en relación contra natura…"**  Finalmente, le imputó al licenciado Rey querer cobrar "un generoso 15% del caudal **por hacer lo que cualquier abogado honrado, empezando por el que suscribe, haría por dos o tres mil dólares…De lo que se trata es de arramplar, cada uno por su lado, lo que se pueda."** (Énfasis suplido).

Posteriormente, el licenciado Irisarri Castro presentó una segunda moción solicitando la descalificación del licenciado Rey en la que hizo las expresiones siguientes:

> "El codemandado Lcdo. José Ángel Rey **decidió aprovechar el fallecimiento de la fiscal Orraca para enriquecerse. Buscó el dinero que no le dieron por vía de testamento, a través de los manejos ilícitos** que seguidamente exponemos. El tenía amistad con la legataria y albacea Lebrón Morges y se puso de acuerdo con ella **para satisfacer su respectivo apetito: la**

> **venganza, en el caso de aquélla, contra su
> rival en amores con la difunta,** que además le
> había desbancado del puesto de heredera; **y el
> enriquecimiento ilícito en el caso del
> abogado.**"

> "El codemandado Lcdo. José Ángel Rey, en
> ejecución, como decimos, **de su plan de privar a
> la herencia a la demandante, y al mismo tiempo
> lucrarse con una buena tajada del caudal, con
> el propósito de asegurar sus honorarios, ideó
> el ilegal procedimiento** de introducir en el
> proyecto de resolución[,] a ser firmado por el
> Honorable Juez, una disposición exorbitante, no
> prevista por la ley ni el testamento: tomar
> posesión de todos los bienes de la finada…"
> (Énfasis suplido en ambos).

Luego de varias incidencias procesales, el foro primario resolvió, en síntesis, que las funciones de un albacea son limitadas. Esto, en virtud de que la albacea había realizado ciertos actos de administración, representación y partición sobre los bienes hereditarios sin el consentimiento de la heredera demandante. Dicho tribunal, además, determinó que el contrato de servicios profesionales, otorgado entre la albacea-legataria y el licenciado Rey, era nulo y que procedía decretar la descalificación de éste como abogado de la sucesión Orraca-López.

Esta decisión fue posteriormente confirmada en todos sus extremos por el foro intermedio apelativo. Mediante Sentencia de 23 de noviembre de 2005, revocamos a los foros recurridos. En Flecha v. Lebrón, 2005 T.S.P.R. 176, 2005 J.T.S. 181, 166 D.P.R.____ (2005), concluimos, en síntesis, que la señora Lebrón Morges era, para todos los efectos

legales, la administradora judicial de los bienes de la herencia de la causante y que, conforme con sus facultades, podía posesionarse de los bienes de la causante y ejercer sobre ellos todas las gestiones permitidas por ley. Resolvimos, además, que los foros recurridos erraron al declarar nulo el contrato de servicios profesionales suscrito entre la albacea-legataria y el licenciado Rey ya que no procedía dicha determinación hasta tanto aquélla no rindiera las cuentas finales de su gestión ante el tribunal. Finalmente, concluimos que no procedía la descalificación sumaria del licenciado Rey como abogado de la sucesión ya que no se había celebrado una vista para permitirle a éste defender su posición y demostrar que no existía un conflicto de intereses en sus gestiones como abogado de la señora Lebrón Morges.

Conviene resaltar que el anterior Tribunal de Circuito de Apelaciones, en su resolución de 6 de octubre de 2003, mediante la cual confirmó la determinación del foro primario, expresó lo siguiente en relación al lenguaje y estilo utilizado por el abogado de la parte allí apelada:

> "Así mismo, cabe señalar que el hecho de que los abogados tengan el deber y responsabilidad de velar por los intereses de sus clientes, inclusive que en el ejercicio de esa responsabilidad litigue con vehemencia, **no implica ni tampoco es permitido que utilice lenguaje indecoroso, despectivo y maltratante**…
>
> Hemos advertido en el escrito de la parte apelada **que el lenguaje y el estilo utilizado por el Lcdo. Irizarry [sic], se caracteriza por ser uno irrespetuoso y poco apropiado, el cual**

> **le falta el respeto, no tan sólo a la parte**
> **apelante en el caso de marras, sino que también**
> **le falta el respeto al tribunal.**" (Énfasis
> suplido).

El 21 de abril de 2004, le concedimos al Procurador General un término de treinta (30) días para que presentara ante esta Curia un informe sobre la queja interpuesta en contra del licenciado Irisarri Castro. El 10 de diciembre de 2004, luego de que se nos remitiera el referido informe, emitimos una Resolución ordenándole al Procurador General presentar querella contra dicho letrado.

El 18 de enero de 2005, el Procurador General presentó la correspondiente querella. En ésta, indicó que el querellado hizo, a través de sus escritos al tribunal, expresiones altamente irrespetuosas contra la señora Lebrón Morges, litigante adversa en el pleito ante el foro primario. Indicó, además, que en los referidos escritos utilizó un lenguaje altamente irrespetuoso, insultante y ofensivo contra el abogado contrario. Finalmente, arguyó que el querellado no había sido sincero ni honrado al expresar en su primera contestación a la querella de 26 de junio de 2001 que la albacea-legataria nunca había reclamado para el caudal los seguros que tenía la causante con el Colegio de Abogados de Puerto Rico, La Asociación de Empleados del E.L.A. y con el Departamento de Justicia. Esto, en virtud de que en un escrito previo, de 28 de mayo de 2001, el querellado había expresado que la señora Lebrón Morges fue "al Colegio de Abogados para que la paguen a la

Sucesión los $15,000 del seguro, al de Fiscales para lo mismo, y a la Asociación de Empleados del ELA para colectar las aportaciones, dividendos y demás derechos que correspondan por el fallecimiento del causante." Por ende, el Procurador General concluyó que al momento de presentar su contestación a la querella, al querellado le constaba el hecho de que la albacea-legataria sí había reclamado los seguros. No obstante, éste expresó lo contrario en su contestación a la querella. Finalmente, indicó que el querellado **había acusado al licenciado Rey y a su cliente de idear un plan para apoderarse ilegalmente de la herencia de la licenciada Orraca López en perjuicio de la heredera**, **cuando del expediente no surgía que éstos actuaran de forma concertada y de común acuerdo para apropiarse de dicha herencia**. Esto, en virtud de que el querellado no aportó ninguna evidencia para fundamentar su alegación sobre el supuesto plan ideado con tales fines. En consecuencia, le imputó al querellado los cargos siguientes:

### CARGO I

El Lcdo. Lucas M. Irisarri Castro incurrió en conducta profesional en violación al Canon 15 de los de Ética Profesional, 4 L.P.R.A. Ap. IX, C. 15, el cual dispone, entre otras cosas, que un abogado debe tratar a los testigos y litigantes adversarios con respeto y consideración. No debe actuar inspirado por la animosidad ni por los prejuicios de su cliente [,] ni debe permitir que éste dirija el caso ni se convierta en la conciencia del abogado.

**CARGO II**

El Lcdo. Irisarri Castro incurrió en conducta profesional en violación al Canon 29 de los de Ética Profesional, 4 L.P.R.A. Ap. IX, C. 29, el cual dispone que los clientes, no los abogados, son los litigantes. Cualquier rencor que exista entre los clientes no debe afectar la conducta de los abogados entre sí ni las relaciones hacia el litigante contrario.

**CARGO III**

El Lcdo. Irisarri Castro incurrió en conducta profesional en violación al Canon 35 de los de Ética Profesional, 4 L.P.R.A. Ap. IX, C. 35, el cual dispone, entre otras cosas, que la conducta de todo miembro de la profesión legal ante los tribunales, para con sus representados y en las relaciones con sus compañeros debe ser sincera y honrada. No es sincero ni honrado el utilizar medios que sean inconsistentes con la verdad ni se debe inducir al juzgador a error utilizando una falsa relación de los hechos o del derecho. El abogado debe ajustarse a la sinceridad de los hechos al examinar testigos, al redactar affidávits u otros documentos y al presentar causas.

El 10 de marzo de 2005, el querellado presentó una extensa contestación a la querella. Mediante la misma indicó, en relación al primer cargo imputado, esto es, infringir el Canon 15 de Ética Profesional, *supra*, que había hecho ciertas expresiones sobre la relación existente entre la licenciada Orraca López y la señora Lebrón Morges porque eran necesarias y pertinentes para una mejor comprensión de las actuaciones de la albacea-legataria y su abogado. Precisó, entre otras cosas, que las expresiones relativas a dicha relación nunca se hicieron fuera del contexto judicial o, de otra forma, en círculos públicos o en los medios. Esgrimió que era necesario poner en posición al tribunal de

comprender una controversia judicial que estaba revestida de matices íntimos ya que, a su entender, las actuaciones de la albacea-legataria respondían al deseo de vengarse de la heredera, persona que, alegadamente, privó a la señora Lebrón Morges "del afecto de la fiscal." Indicó que tenía la obligación de ilustrar al tribunal sobre el alegado ánimo de venganza de la albacea-legataria. Indicó que sus expresiones eran pertinentes y que, aunque incómodas para las partes, no podían dejarse de hacer.

Con relación al segundo cargo imputado, esto es, infringir el Canon 29 de Ética Profesional, *supra*, esgrimió algo análogo a lo expresado en relación al primer cargo. Esto es, que las palabras y frases empleadas para referirse a las actuaciones del licenciado Rey eran necesarias para poner al tribunal en posición de entender las intenciones de dicho letrado en relación a los bienes del caudal. Indicó que todo lo aseverado en sus escritos, relacionado al contrato de servicios profesionales suscrito entre el licenciado Rey y la albacea-legataria, así como a la previa relación profesional entre aquél y la causante era cierto. Expresó, además, que es importante distinguir entre las expresiones que se hacen con el único propósito de ofender o herir de aquéllas que se hacen para explicar adecuadamente una situación y, con dicho fin, defender los intereses de un cliente.

Finalmente, con relación al tercer cargo, referente a su alegada infracción del Canon 35 de Ética Profesional, *supra*, arguyó que no había ninguna inconsistencia en cuanto a las expresiones que hiciera en dos escritos distintos, en relación a la reclamación hecha por la albacea-legataria de los fondos acumulados que tenía la causante en distintas entidades públicas y privadas. Esto, en virtud de que, alegadamente, en ambas ocasiones dijo exactamente lo mismo: que la albacea-legataria intentó cobrar los seguros para sí porque figuraba en la tarjeta como beneficiaria, pero que, al constatar que en realidad correspondían a la heredera, dejó de hacerlo. Expresó que en ningún momento aceptó que la albacea-legataria haya reclamado los referidos fondos.

Mediante Resolución de 12 de abril de 2005, designamos Comisionado Especial al licenciado Enrique Rivera Santana para recibir y evaluar la prueba relacionada a la querella interpuesta contra el querellado y referirnos sus determinaciones de hechos y recomendaciones.

Luego de varias incidencias procesales, el 30 de noviembre de 2006, el Comisionado Especial nos remitió su informe. En éste, concluyó que el querellado había infringido el Canon 15 de Ética Profesional, *supra*, al realizar ciertas expresiones dirigidas a la demandada, señora Lebrón Morges, así como a la difunta licenciada Orraca López, que no se ajustan con lo que debe ser el comportamiento ético que preceptúa el antedicho Canon.

Indicó que el letrado de epígrafe, en más de una ocasión, acusó a la demandada de vivir "largos años en la casa de la difunta en relación contra natura", acusándola, además, junto a su abogado de querer "arramplar cada uno lo que pueda", catalogándola de "compañera sentimental" de la causante e inculpándola de asumir una actitud revanchista "en contra de su rival de amores con la difunta."

Asimismo, concluyó que el querellado desvirtuó la norma ética contenida en el Canon 29 de Ética Profesional, *supra*, al hacer un sinnúmero de expresiones ofensivas, infundadas e impropias contra el licenciado Rey, abogado de la parte demandada en el pleito en el cual el querellado representaba a la heredera demandante.  Fundamentó dicha conclusión en que el licenciado Irisarri Castro repetidamente acusó al licenciado Rey de intentar apropiarse del caudal de la heredera, de haber ideado un plan ilícito para perjudicar a la demandante, de haber actuado con doblez y "malas artes", de ser mentiroso y de intentar engañar al tribunal, por nombrar algunas.  Todo esto sin presentar evidencia que fundamentara tales alegaciones.

En cuanto al tercer cargo, mediante el cual se le imputó al querellado haber violentado el Canon 35 de Ética Profesional, concluyó que, en efecto, el querellado lo había infringido.  Basó tal conclusión en que el querellado se había alejado de su deber de sinceridad al hacer afirmaciones falsas ante el tribunal.  Utilizó como ejemplo

las alegaciones, realizas sin base o evidencia alguna, de que el licenciado Rey había ideado un "plan maquiavélico" para despojar a la heredera de sus bienes y para apropiarse de parte del caudal hereditario. Indicó, además, que el licenciado Irisarri Castro no fue sincero al afirmar, falsamente, en la Moción Urgente Solicitando Remedios Provisionales que en la vista de 2 de mayo de 2000 el "Lcdo. Rey tenía en su maletín, firmado por la albacea, un contrato de servicios profesionales." Esto en virtud de que la albacea-legataria suscribió dicho contrato con posterioridad, esto es, el 11 de mayo de 2000.

El Comisionado Especial indicó que en la vista en su fondo sobre la investigación de la querella, el querellado intentó disminuir el alcance de sus expresiones, señalando que su ánimo no fue ofender o herir, que su intención fue la de defender a su cliente y que redactó la demanda a prisa. Finalmente, señaló que el querellado no modificó su lenguaje, estilo y tono hasta que esta Curia resolviera en contra de su cliente en Flecha v. Lebrón, *supra*.

El 22 de enero de 2007, el querellado presentó un extenso escrito objetando el informe del Comisionado Especial. Con respecto al primer cargo imputado, hizo referencia a las declaraciones ofrecidas por la albacea-legataria, en calidad de testigo, en la vista ante el Comisionado Especial. Indicó que a preguntas del Procurador General en su examen directo, la señora Lebrón Morges no

dijo nada con respecto a sentirse ofendida por las expresiones del querellado. Intimó que ésta nunca se sintió ofendida por sus alegaciones, reiterando que había discutido ciertos pormenores de la vida íntima de la causante y la albacea-legataria por cuanto era necesario para una mejor comprensión de la controversia. Arguyó que no hizo otra cosa que decir la verdad. Con relación al segundo cargo imputado, indicó que del testimonio directo del licenciado Rey en la vista ante el Comisionado Especial, no se desprendía que éste se haya sentido ofendido por las expresiones contenidas en sus escritos. Asimismo, alegó que sus expresiones fueron hechas para defender a su cliente de lo que, alegadamente, pretendían hacer la albacea-legataria y su abogado, esto es, despojarla de la herencia de la causante. Con relación al contrato de servicios profesionales sucrito entre la señora Lebrón Morges y el licenciado Rey, mediante el cual éste recibiría un 15% de los bienes del caudal, señaló que el mismo tenía el efecto de disminuir la cantidad que recibiría la heredera ya que luego de pagadas las deudas del caudal, entre las que se encontraban las acreencias del licenciado Rey con la causante, aquél hubiera recibido, por concepto de honorarios, más dinero que la heredera. Finalmente, en relación al tercer cargo imputado, esgrimió que el Comisionado Especial enmendó la querella presentada por el Procurador General, acusándolo de algo distinto a lo que se

le imputaba en la misma. Esto en virtud de que en dicha querella se fundamentó la infracción del Canon 35 en que el querellado había mentido al expresar que la albacea-legataria nunca reclamó los beneficios de la causante en el Colegio de Abogados, la Asociación de Empleados del ELA, entre otros, mientras que en el informe del Comisionado Especial, se le encontró que violó el Canon 35 por haber mentido sobre la fecha en que la albacea-legataria suscribió el contrato de servicios profesionales con el licenciado Rey. Alegó que dicho proceder violaba su derecho constitucional a un debido proceso de ley. No obstante, dejó de mencionar que tanto en la querella como en el informe del Comisionado Especial se le imputó violar el referido Canon por alegar, sin presentar prueba alguna, que el quejoso y su cliente habían ideado un plan para despojar a la señora Flecha Quiñones de sus bienes hereditarios.

Estando en posición de resolver, procedemos a así hacerlo.

## II

De entrada, reiteramos que los Cánones de Ética Profesional establecen las **normas mínimas** que deben guiar a los miembros de la profesión en el desempeño de su delicada e importante labor. La meta de todos los abogados debe ser la de actuar a un nivel superior a lo mínimo preceptuado por dichos Cánones.[5] Hemos pautado que la práctica de la

---

[5] *In re*: Filardi Guzmán, 144 D.P.R. 710 (1998); *In re*: Matos González, 149 D.P.R. 817 (1999).

abogacía, distinto quizás a otras profesiones, conlleva una seria y delicada función ciudadana ya que ésta representa servicio, ética y ejemplo.[6] Los abogados y abogadas son funcionarios del Tribunal y ministros ordenados de la justicia y, como tales, sus actuaciones deben estar encaminadas a mantener un orden jurídico íntegro y eficaz, orientado esencialmente por los principios de vida democrática y de respeto a la inviolable dignidad del ser humano.[7] Por ser los abogados el espejo donde se refleja la imagen de la profesión, éstos deben actuar con el más escrupuloso sentido de responsabilidad que impone la función social que ejercen.[8]

Por estar estrechamente relacionados, discutiremos conjuntamente los dos primeros cargos imputados al querellado. Veamos.

Hemos resuelto que el Canon 15 de Ética Profesional, *supra*, exige que el abogado **trate a los litigantes contrarios**, y a sus testigos, **con respeto y consideración**. Los abogados, actores principales en la litigación, deben ejercer, al máximo de sus facultades, **el deber de cortesía**, **respeto y consideración** que les impone el mencionado Canon.

---

[6] *In re*: Cuyar Fernández, 2004 T.S.P.R. 164, 2004 J.T.S. 168, 163 D.P.R. ___ (2004); *In re*: Cintrón Colón, 2004 T.S.P.R. 73, 2004 J.T.S. 81, 161 D.P.R. ___ (2004); Ramos Acevedo v. Tribunal Superior, 133 D.P.R. 599, 613 (1999).

[7] *In re*: Cintrón Colón, *supra*.

[8] *In re*: Cuyar Fernández, *supra*; *In re*: Santiago Rodríguez, 2003 T.S.P.R. 137, 2003 J.T.S. 137, 160 D.P.R.___ (2003).

El abogado jamás debe olvidar que siempre debe actuar con gran celo, cuidado y prudencia. Si bien es cierto que el abogado tiene la obligación de defender la causa del cliente que le fue encomendada con gran vigor, energía y vehemencia, **ello no implica que éste pueda ser poco respetuoso o prudente.** El abogado debe evitar, en todo momento, que sus expresiones puedan ser interpretadas, por los demás participantes del proceso judicial, **como que está poniendo en tela de juicio su honradez, moral y honestidad.**[9]

Por otra parte, el Canon 29 de Ética Profesional, *supra*, dispone que **debe evitarse, escrupulosamente, toda cuestión personal entre los abogados** y proscribe conducta impropia entre abogados al tramitar pleitos. Los Cánones de Ética Profesional le imponen a todo abogado **el deber de mantener relaciones cordiales y respetuosas con sus compañeros abogados.**[10] Esto ya que, como expresáramos en una ocasión anterior, la estatura moral e intelectual inherente al ejercicio de la abogacía impone un debate jurídico **libre de personalismos y posiciones subjetivas que lo degraden a vulgar diatriba.**[11] Nos reafirmamos en que la cordialidad y la amabilidad deben ser el estilo de trato con los colegas. Si en el ardor de las defensas, en determinadas

---

[9] *In re: Matos González*, *supra*; Véase, además, *In re: Rodríguez Torres*, 104 D.P.R. 758, 765 (1976).

[10] *In re: González Carrasquillo*, 2005 T.S.P.R. 78, 2005 J.T.S. 83, 164 D.P.R. ___ (2005).

[11] *In re: Martínez Texidor*, 130 D.P.R. 905 (1992).

circunstancias, acaloran los ánimos y provocan distanciamientos, ello no debe perdurar; sobrevenida la calma reflexiva, debe reanudarse sin demora ese estilo, para mantener la dignidad y jerarquía de la profesión.[12] Asimismo, hemos manifestado que la defensa del cliente no puede ser excusa para el irrespeto y menos para lastimar la dignidad personal del abogado de la parte contraria. La práctica de la abogacía exige hacia los tribunales constante respeto. Para reclamar derechos y solventar controversias no es menester lastimar la dignidad personal ni institucional de los miembros de la judicatura, **como de ninguna otra persona**.[13]

Con el marco jurídico esbozado y atendiendo nuestra jurisprudencia, procede evaluar la conducta del querellado para determinar si éste, en efecto, infringió los Cánones 15 y 29 de Ética Profesional. Veamos.

Mientras representaba a una de las partes de un litigio civil, el querellado utilizó un lenguaje soez, altanero y destemplado para referirse a la parte contraria en dicho litigo. Tal como lo recoge la relación fáctica que antecede, en más de una ocasión el querellado le imputó a la señora Lebrón Morges haber vivido en una relación homosexual "contra natura" con la licenciada Orraca López. De igual

---

[12] *Íd,* citando a R.H. Viñas, Ética y Derecho de la Abogacía y de la Procuración, Buenos Aires, Eds. Pannedille, 1972, págs. 262-263.

[13] *In re*: Markus, 158 D.P.R. 881 (2003).

manera, le imputó a la albacea-legataria haber actuado movida por la venganza y el revanchismo con el único fin de perjudicar a su "rival en amores." Indicó, entre otras cosas, que la causante, persona ya fallecida y quien no podía defenderse, había alterado sus testamentos según el "calor de sus relaciones." Finalmente, le imputó a la demandada querer "arramplar" para sí parte de la herencia.

Ante estas desafortunadas y reprochables expresiones, resulta forzoso concluir que el querellado infringió el Canon 15 de Ética profesional. Adviértase que estas alegaciones fueron emitidas en varios escritos ante el foro primario y ante el Tribunal de Apelaciones, sin prueba que las sustentara. Adviértase, además, que el foro intermedio apelativo se expresó con relación al tono empleado por el querellado. Dicho tono y estilo no varió hasta tanto esta Curia revocara a los foros recurridos en Flecha v. Lebrón, *supra*. Finalmente, surge del informe del Comisionado Especial que el querellado, luego de casi seis (6) años de injuriar y vilipendiar, tanto a una persona ya fallecida como a la litigante adversa, mostró un levísimo arrepentimiento, intentando limitar el alcance de sus expresiones al indicar que no tuvo el ánimo de herir u ofender y que había redactado ciertos escritos legales de forma apresurada. No nos persuade.

De igual manera, concluimos que el querellado infringió el Canon 29 de Ética Profesional en reiteradas ocasiones.

Basta una somera lectura de sus expresiones para constatarlo. En diversos escritos, y en diversas instancias procesales, el querellado expresó que el licenciado Rey se había convertido en un "heredero postizo" que, al morir la causante, creyó "llegada la hora de sus desvelos profesionales." De igual forma, acusó al referido abogado, sin presentar prueba alguna, de haberse puesto de acuerdo con su cliente para "idear un plan maquiavélico" que tenía como único fin perjudicar a la heredera. Le imputó, además, "doblez y malas artes", haber tenido "la puñalada preparada" para dársela en la espalda, tener una "apetencia crematística", ser inescrupuloso, estar únicamente motivado por el dinero, querer llevarse una "suculenta tajada de la herencia", ser poco honrado al cobrar honorarios profesionales, entre otros insultos y vituperios.

Este Foro, como custodio de la profesión, no puede condonar tal comportamiento. El hecho de que el querellado se haya formado jurídicamente fuera de Puerto Rico no equivale a que éste, ni ningún otro abogado que ejerza la profesión en Puerto Rico, pueda tener en sus manos un cheque en blanco para, mediante los procesos judiciales, libremente insultar y atacar a una parte contraria y, a su abogado, en un litigio. El respeto y la cortesía son criterios universales. Fundamentar que el querellado pudo haber obrado de tal manera por el mero hecho de no haberse formado en Puerto Rico, tal como lo intima su representación legal

en su escrito objetando el informe del Comisionado Especial, no es excusa para incumplir y violar las normas éticas aplicables a los abogados en Puerto Rico. Concluimos que el querellado violentó el Canon 29 de Ética Profesional, *supra*.

Finalmente, con relación al tercer cargo imputado, coincidimos, tanto con el Procurador General como con el Comisionado Especial, en que el querellado infringió repetidamente su deber de ser sincero y honrado al aseverar en un sinnúmero de ocasiones que el licenciado Rey y su cliente habían ideado un plan para privar a la heredera de su parte de la herencia. Tal alegación nunca fue avalada, o de otra forma sustentada, mediante prueba. Adviértase que el querellado le imputó al licenciado Rey haber infringido los Cánones 35 y 38 de Ética Profesional sin juramentar su queja. Sabido es que una información falsa, presentada por abogados al tribunal, constituye conducta profesional reprobable. La mentira degrada el carácter y envilece el espíritu y es antítesis de la conducta recta y honorable que el Código de Ética Profesional exige de todo abogado. Jugar al esconder con la justicia es como jugar al esconder con la verdad, es práctica deleznable.[14]

Si bien el Comisionado Especial no hace mención de atenuantes en su informe, surge del expediente que la disputa por la herencia de la licenciada Orraca López se transigió con la anuencia del querellado y del quejoso y que

---

[14] *In re: Cuyar Fernández*, *supra*; *In re: Filardi Guzmán*, *supra*; *In re: Ramos y Ferrer*, 115 D.P.R. 409, 412 (1984).

éstos condujeron los trámites de dicha transacción de forma armoniosa. Surge de nuestros archivos que la presente es la primera querella que se interpone contra el querellado en diez y seis (16) años de práctica profesional y que éste, durante la vista ante el Comisionado Especial, admitió que su intención no fue herir u ofender a nadie.[15] Esto, no obstante, a juicio del Comisionado Especial, no ocurrió hasta después que esta Curia resolviera el caso de Flecha v. Lebrón, *supra*, donde revocamos a los foros inferiores que le habían dado la razón al cliente del querellado. Asimismo, debemos recalcar que en la disputa por los bienes de la causante ninguna de las partes sufrió pérdidas económicas o, de otra manera, vio frustrada su intención de vindicar sus derechos en los tribunales.

Por último, es sabido que corresponde al Comisionado Especial, designado por este Tribunal, atender una querella presentada contra un abogado, recibir la prueba, así como evaluar y dirimir la evidencia conflictiva. Tal funcionario ocupa el papel de juzgador de primera instancia y, por lo tanto, está en mejor posición para aquilatar la prueba testifical. Sus determinaciones de hecho, basadas en la

---

[15] Conviene señalar que mediante Resolución de 2 de junio de 2006, luego de examinar el informe del Procurador General, así como la contestación del licenciado Irisarri Castro, archivamos una queja presentada el 3 de abril de 2003 contra dicho abogado por parte del entonces Secretario del Departamento de Asuntos del Consumidor, licenciado Javier Echevarría Vargas. Dicha queja versaba, esencialmente, en unas expresiones que hiciera el licenciado Irisarri Castro en unos escritos sometidos ante dicha agencia.

prueba testifical merecen nuestra mayor deferencia. Cuando esas determinaciones están sostenidas por la prueba obrante en nuestro expediente, no intervendremos con las mismas, ausente de una demostración de pasión, prejuicio, parcialidad o error manifiesto en su apreciación.[16] No encontramos que el Comisionado Especial haya incurrido en error. Por tal motivo no habremos de intervenir con la formulación de sus determinaciones de hechos y recomendaciones.

### III

Por los fundamentos antes expuestos, decretamos la suspensión del licenciado Lucas Irisarri Castro de la práctica de la abogacía por espacio de dos (2) meses. Asimismo, reiteramos que la clase togada tiene la obligación que imponen nuestros Cánones de Ética Profesional de tratar a los litigantes adversos y a sus compañeros abogados con respeto, decoro y cordialidad.

Se dictará Sentencia de conformidad.

---

[16] *In re*: Rodríguez Feliciano, 2005 T.S.P.R. 130, 2005 J.T.S. 136, 165 D.P.R. ___ (2005).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re

CP-2005-1

Lucas Irisarri Castro

SENTENCIA

San Juan, Puerto Rico, a 28 de septiembre de 2007.

Por los fundamentos expuestos en la Opinión *Per Curiam* que antecede, la cual se hace formar parte íntegra de la presente, decretamos la suspensión del licenciado Lucas Irisarri Castro de la práctica de la abogacía por espacio de dos (2) meses. Asimismo, reiteramos que la clase togada tiene la obligación que imponen nuestros Cánones de Ética Profesional de tratar a los litigantes adversos y a sus compañeros abogados con respeto, decoro y cordialidad. Se dictará Sentencia de conformidad.

Se le impone al abogado querellado el deber de notificar a todos sus clientes de su inhabilidad para continuar representándolos, devolverles cualesquiera honorarios recibidos por trabajos no realizados e informar oportunamente de su suspensión a los distintos foros judiciales y administrativos del país.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez no interviene.

Dimarie Alicea Lozada
Secretaria del Tribunal Supremo, Interina